UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

RASHAWN CHAPMAN,

                          Petitioner,

        -vs-                          **No. 6:07-CV-6583(MAT)**
                                      **DECISION AND ORDER**
M. BRADT, Attica Correctional
Facility Superintendent,

                          Respondent.

_____

## I.    Introduction

    Proceeding <u>pro se</u>, Rashawn Chapman ("Petitioner") filed a
petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.
Petitioner's state custody arises from a judgment, entered on
October 3, 2003, in Niagara County Court (Broderick, Sr., J.) of
New York State, convicting him, following a jury verdict, of
Manslaughter in the First Degree (N.Y. Penal Law ("P.L.") §
125.20(1)) and related charges.

## II.   Factual Background and Procedural History

### A.    Petitioner's Trial

    The convictions here at issue stem from the fatal shooting of
Douglas Scott ("Scott") on June 20, 2001, in the City of Niagara
Falls, New York. At approximately 12:30 p.m. on June 20, 2001, the
Niagara Falls Police Department received a call that a man had been
shot on the 400-block of 10th Street. Responding officers found 20-
year-old Scott lying on the sidewalk in front of a house located at

-1-

462 10th Street, bleeding from an apparent gunshot wound to the chest. A box-cutter razor and a baseball bat were found nearby. Scott was taken to the hospital where he died from his injuries. The gun used in the shooting was identified as a .357-magnum Smith & Wesson revolver.

Fourteen-year-old Demetrius Nix ("Nix"), who had a history of disputes with Scott, was identified as the shooter. Nix was friends with Petitioner, who also had had problems with Scott in the past. Nix, with Petitioner's help, evaded police for several days before being apprehended and charged with murder. During their investigation, the police developed the theory that Petitioner had provided Nix with the gun and assisted him in killing Scott. Petitioner was arrested and indicted for intentional murder and depraved indifference murder, criminal facilitation, hindering prosecution, and second and third degree criminal possession of a weapon. Nix was permitted to plead guilty to manslaughter as a juvenile offender in exchange for agreeing to testify truthfully against Petitioner.

At trial, Nix testified that he had left school after 8th grade and at the time of the shooting, basically was living on the street, accepting money from friends and selling drugs in order to support himself. One of his best friends was Lotha Goldsmith, killed on June 14, 2001, who owned a .357-magnum Smith & Wesson pistol, nicknamed "Loth". "Loth" was kept at the house of an

acquaintance, Michelle Nesbit ("Nesbit"), and Nix was free to take it from the house anytime he wanted.

Nix related that he had been involved in several increasingly violent altercations with Scott. On June 20th, Nix was at his cousin Keith's house when Scott attacked him, slamming him against the porch and slashing his back and neck with a box-cutter while attempting to cut his throat. After Scott was pulled off Nix by passers-by, Nix and his cousin walked up 7th Street where they met some friends and told them what happened. Nix decided to follow Scott and confront him in a fair fight. Nix and his friends walked toward 9th Street, down Ferry Avenue, to a store where testified they met Petitioner.

Nix said that Petitioner told Nix's friends to leave, and he and Nix walked down the alley from Ferry toward Niagara Street where they stopped and talked in back of a house fronting on the alley. Nix showed Petitioner his cuts received during Scott's recent attack. According to Nix, Petitioner told him that he, too, had had problems with Scott and said, "I'm going to handle this for you." T.491-92, 496.[1] Nix understood that "handling the problem" meant that Petitioner "was going to shoot him." T.496. Nix testified that Petitioner then directed him to go out front and

---

[1]

Citations to "T." refer to the pages from the transcript of Petitioner's criminal trial. That transcript, and the transcripts of other proceedings conducted in the course of the trial, were filed by Respondent in connection with his answer. See Dkt ##21-1 to 21-9. Citations to "SR." refer to pages from the state-court records also filed by Respondent. See Dkt #19 (Volume 1); Dkt #20 (Volume 2).

look for Scott. Nix peered around the corner but did not see Scott.
He went to the back of the house and informed Petitioner, who said
that he would go see where Scott was. T.494-95. Petitioner began
walking down the alley toward Niagara Street to look for Scott.
T.495. Nix said that prior to leaving, Petitioner gave him a silver
.357-magnum gun to hold "for a second." T.497. Nix leaned against
the house with his back to the wall and remained there for a minute
or two, looking between the houses. T.498.

Nix testified that he first spotted Scott when he was about 12
feet away. Scott appeared angry to Nix and was brandishing a
baseball bat. T.570. Nix testified said that he was afraid if he
tried to run, Scott would hit him with the bat, and that Scott was
so close that Nix was prevented from running out of the yard.
T.501-03. However, Nix did not think Scott could have hit Nix when
Nix first saw Scott. T.504, 586. When Scott was about four feet
away, Nix turned around, aimed, and shot him once in the chest.
T.501. Scott staggered, falling back toward the alley, clutching
his chest. T.504.

Nix related that after the shooting, he ran back out toward
the alley and met Petitioner in the alley outside of the yard,
where he returned the gun to Petitioner. Petitioner ran in a
different direction but they both ended up at Nesbit's house. After
telling Petitioner he would meet him at Unity Park housing complex,
Nix left again through the back door. Petitioner met Nix in a field

outside of the complex, after which they went to Petitioner's Uncle PeeWee's house. Petitioner gave the gun to his uncle and told him to "put it up", but Nix did not see it was placed. T.513-15. For the next several days, Nix traveled between Niagara Falls, Lockport, and Buffalo, sometimes by himself and at other times with Petitioner, staying at houses belonging to his friends or to friends and relatives of Petitioner. T.516-28. He finally returned to Niagara Falls, staying in an abandoned house on 5th street for a few hours before going to a house on Robinson Court occupied by a person known as "Benny." Nix stayed overnight and was arrested there the next day.

Anthony Brantley ("Brantley"), who had a lengthy criminal history, was the only other individual to testify for the prosecution who claimed to have witnessed any of the events surrounding the shooting. He stated that on June 20, 2001, he was sitting on his uncle's porch at 929 Ferry Street when he saw Nix stop at a store on 9th Street and Ferry Avenue to talk to Petitioner. Brantley said he was familiar with both men, although he did not testify as to how well he knew them. T.369-71. According to Brantley, Petitioner and Nix walked together into the alley between 9th and 10th Streets, as did several people in front of them, but that Petitioner did not go all the way into the alley. T.371-72. Five or ten minutes later, Brantley heard shots and saw a lot of people running, including Nix and Petitioner, who were

running towards 9th Street. T.373-74. Brantley did not see a gun displayed by Nix or Petitioner and did not know where the shot originated.

Victor Johnson ("Johnson"), who also had a lengthy criminal history, testified that he knew both Petitioner and Nix from the streets. Johnson recovered the gun used in the shooting for the police; in exchange, the police dropped several drug charges pending against his girlfriend. Johnson testified that the gun originally belonged to his deceased cousin, Goldsmith. T.665, 670. Johnson contradicted Nix's testimony that Petitioner had possession of the gun after the shooting inasmuch as Johnson stated that Nix told him that he (Nix) had put it in a house located next door to the one in which he was staying. T.649-50. Johnson testified that he later gave the gun to Petitioner but did not know where he took it. T.651. Later, Johnson said he was told by a woman nicknamed "Brooklyn" that the gun was in her house and that he should take it from that location. Johnson testified that he did so and hid it in a relative's house on Pierce Street where it remained until he turned it over to police. T.652-54.

The prosecution also called jailhouse informant Michael Cox ("Cox"), who was housed in the same cell block as Petitioner in November or December 2001. According to Cox, they talked "practically every day." T.693-95. Petitioner told Cox that he had seen "Mimi" (i.e., Nix) fight with someone named Doug (i.e.,

Scott). At the time, Petitioner had been at the "weed house". Cox testified that Mimi went inside the house where he had been staying and came outside again. Petitioner, who was accompanied by some of their friends, promised to help Mimi go after Doug. According to Cox, Petitioner said that he gave Mimi a gun while they were in an alley behind a house; the alley was Petitioner's shortcut to "Michelle's" house. Petitioner told Cox that "Mimi had to do his own shooting because it wasn't him [i.e., Petitioner] that got his ass whooped." T.706, 730. Petitioner told Cox that Mimi had wanted to shoot Doug, and that Petitioner did, too, because he himself had had issues with Doug. T.703, 705, 730. Petitioner related to Cox that Doug had come around the  house, swinging a bat, before being shot. Later on the day of the shooting, Petitioner hid the gun in Michelle's house, and then Petitioner and Mimi changed clothes at Petitioner's grandmother's apartment. Petitioner asked his grandmother if Mimi could stay with her awhile, as Mimi was avoiding the police. Subsequently, Cox testified, Petitioner told him that Michelle brought the gun to "Brooklyn's" house, and Petitioner told Brooklyn to give it to Johnson.

Samuel Eaddy ("Eaddy"), another jailhouse neighbor of Petitioner's, testified for the prosecution. Petitioner was housed one cell away from Eaddy at Wende Correctional Facility where Petitioner had stayed temporarily for purposes of attending a court date. Petitioner told Eaddy that he had seen Nix fight on a porch

with another person, whose name Eaddy did not recall. During the fight, Nix had been cut. He was about to leave the area when Nix stopped to talk with Petitioner. Petitioner told Eaddy that he had given Nix a gun and told him to hold it while Petitioner obtained a second gun. Petitioner explained to Eaddy that he then approached the man (i.e., Scott) who had beaten up Nix and told him that Nix had asked for Petitioner's help, that Petitioner was going to get a gun for him, and that Nix was waiting for this man. T.762, 786-88. The man asked Petitioner where Nix was, "got a stick or something", and "went charging" toward Nix, who shot him. T.762, 763. Petitioner told Eaddy that he previously had problems with the man Nix had shot.

The defense's sole witness was Michelle Nesbit, who lived with Petitioner and referred him to as her "brother". At her apartment on 9th Street in Niagara Falls, Nesbit kept a .357-magnum revolver in either the front living room couch, a couch in the back room, or a kitchen drawer. Lotha Goldsmith had brought the gun to her house before his death. Nix, whom Nesbit had known for about a month before June 2001, sometimes would borrow the gun and then return it to her apartment.

Petitioner slept at Nesbit's apartment on June 19, 2001, as did Rashi Perry ("Perry"). Sometime before noon on June 20th, Petitioner and Perry left to go buy "some weed." Nesbit was alone in the apartment when Nix came by to see Petitioner. He told Nesbit

-8-

that he had been "cut" in a fight and then went to the back of the apartment. Nesbit did not see what Nix was doing there. Shortly thereafter, Nix left the apartment. About five or ten minutes later, he returned through the back door.

On June 21, 2001, Nesbit permitted the police to search her apartment. However, the police did not find a gun. Nesbit informed the police that when Scott had been murdered, Petitioner was on the other side of the city. She had paged Petitioner at 12:30 p.m. on June 20, 2001, and had had Nix speak to Petitioner once Petitioner responded to the page. Nix told Petitioner during that conversation that he would meet him across town. Nix and Petitioner also talked about finding a change of clothing for Nix.

Three months later, Nesbit informed the police that the foregoing statements were false. Nesbit gave a new statement, indicating that on the day of the shooting, Petitioner came in through the front door of her apartment, and Nix came in through the back door. "[S]omeone"—probably Petitioner—"said that somebody got shot." T.835, 872. Nesbit moved to 1028 South Avenue in about September 2001, but did not move the gun to her new apartment. She professed not to know how it eventually ended up there. Petitioner sometimes visited her at the South Avenue apartment, and Johnson visited there frequently. At some point, Nesbit paged Johnson and asked him to meet her outside of her friend Brooklyn's house, where Nesbit gave Johnson the gun.

-9-

During the police investigation of the crime scene, Niagara Falls Police Department Detective James Lincoln ("Detective Lincoln") and found a green plastic-handled box cutter razor on the sidewalk and a silver aluminum bat lying at the curb in front of the house at 462 10th Street. Detective Lincoln estimated that the distance from the front to the back of 462 10th Street was between 35 and 40 feet.  He observed drops of blood on a sidewalk just to the side of the front porch at 462 10th Street. T.421-435. However, Detective Lincoln saw no blood on the sidewalk that led to the back of 462 10th Street. Nor did he find any blood on sidewalk that led from the alley to the rear door of the house. T.427, 431. The area behind the house as it opened onto the alley was free of any obstructions or fences. T.433.

On June 13, 2003, the jury returned a verdict acquitting Petitioner of second-degree murder (P.L. § 125.25(1)) as an accomplice, but convicting him of first-degree manslaughter as an accomplice. The jury also returned guilty verdicts on the charges of Criminal Facilitation in the Second Degree (P.L. § 115.05), Criminal Possession of a Weapon in the Second Degree (P.L. § 265.03(2)), and Criminal Possession of a Weapon in the Third Degree (P.L. § 265.02(4)).

Defense counsel then moved pursuant to New York Criminal Procedure Law ("C.P.L.") § 330.30 in Niagara County Court to set aside the verdict on the basis of legally insufficient evidence to

support the convictions. Judge Broderick found that "[t]here is a valid line of reasoning and there are permissible inferences that could lead a rational person to the conclusion reached by this jury on the basis of the evidence at this trial[,]" that the prosecution "satisfie[d] the proof and burden requirements for every element of the crimes of first-degree manslaughter, second-degree criminal facilitation, second-degree criminal possession of a weapon and third-degree criminal possession of a weapon." SR.144-45 (citations omitted). Judge Broderick, however, found that he had erred with regard to hindering prosecution jury charge given to the jury because it failed to include as an element the requirement of proving the underlying murder. SR.146 (citations omitted). Accordingly, Judge Broderick reversed the hindering prosecution conviction. Id. Petitioner's remaining contentions were discussed and found to be without merit.

On October 3, 2003, Judge Broderick sentenced Petitioner to the following concurrent sentences: a determinate, 25-year prison term on the first-degree manslaughter conviction; an indeterminate term of 5 to 15 years on the criminal facilitation conviction; a determinate 15-year term on the second-degree weapons possession conviction; and a determinate prison term of 7 years on the third-degree weapons possession conviction. All of the determinate sentences carried a 5-year term of post-release supervision ("PRS"), except the third-degree weapons possession conviction,

-11-

which carried a 3-year term of PRS.

**B.   Post-Conviction Proceedings in State Court**

Represented by new counsel, Petitioner pursued a direct appeal. On June 9, 2006, the Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed Petitioner's conviction. People v. Chapman, 30 A.D.3d 1000 (4th Dep't 2006). On August 28, 2006, the New York Court of Appeals denied Petitioner's application for leave to appeal. People v. Chapman, 7 N.Y.3d 811 (2006)

On or about June 20, 2012, Petitioner filed a motion to vacate pursuant to C.P.L. § 440.10, arguing that trial counsel was ineffective for not contacting various unidentified witnesses, including a potential witness who had allegedly reported the shooting, for the purpose of refuting the testimony of the jailhouse informants. Petitioner also argued that trial counsel was ineffective for not objecting to the inconsistent verdicts and for not arguing that counts 5 and 6 of the indictment were jurisdictionally defective. In a decision dated October 24, 2012, the County Court (Farkas, J.) denied vacatur, finding that under the totality of the circumstances, trial counsel had provided meaningful representation, rejecting Petitioner's other claims.

**C.   The Federal Habeas Proceeding**

Petitioner timely filed his habeas petition in this Court. On or about January 2, 2008, Petitioner filed a motion to stay his

habeas petition, which the Court (Arcara, D.J.) granted on April 22, 2008. At the Court's request, Petitioner provided updates regarding the status of his state-court exhaustion proceedings. On June 20, 2014, the stay was lifted, and the case was restored to the Court's active docket. Respondent filed an answer and opposition memorandum of law. Petitioner did not file a reply. For the reasons discussed below, the request for a writ of habeas corpus is denied.

## III. Discussion

### A. Failure to Charge the Jury that a Box-Cutter and a Baseball Bat are "Dangerous Instruments" (Petition, ¶ 22(A))

Petitioner contends that the trial court erred in denying defense counsel's request that the jury be charged, in connection with the self-defense instruction, that the bat and box-cutter found at the crime scene were "dangerous instruments" as a matter of law. On direct appeal, the Appellate Division denied this claim as without merit.

In general, the correctness of a state court's jury instructions is a matter of state law that does not raise a federal constitutional question. See Cupp v. Naughten, 414 U.S. 141, 146 (1973). The Second Circuit has explained that "federal courts must . . . defer to state-court interpretations of the state's laws, so long as those interpretations are themselves constitutional . . . ." Davis v. Strack, 270 F.3d 111, 123 n. 4 (2d Cir. 2001).

Here, the Appellate Division held that the trial court had properly denied defense counsel's request to instruct the jury that the "box cutter and baseball bat in the victim's possession were dangerous instruments as a matter of law[,] inasmuch as those were disputed issues of fact for the jury's resolution." People v. Chapman, 30 A.D.3d at 1002 (citation omitted). Judge Broderick instructed the jury regarding the defensive use of deadly physical force under P.L. § 35.15(2)(a). See T.1032-33. Neither P.L. § 35.15 nor the criminal pattern jury instruction regarding deadly physical force mentions "dangerous instruments", and thus there is no basis to assert that Judge Broderick erroneously omitted a necessary part of the charge. Dangerous instrument is defined in the Penal Law as something "which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury." N.Y. PENAL LAW § 100.13. Thus, defining what is a dangerous instrument does not entail simply looking at the characteristics of the object; rather, it is context-specific and requires a factual determination regarding how and where the object was used or threatened to be used. This places the issue squarely within the jury's province.

In the context of evaluating Petitioner's asserted defense of justification, the jury was required to determine whether Nix "reasonably believe[d] that such other person [Scott] is *using or about to use* deadly physical force," N.Y. Penal Law § 35.15(2)(a),

unless Nix could have retreated. Thus, even if the jury had been instructed that the bat and the box-cutter were dangerous instruments, *and* the jury determined that Scott was about to use them to inflict deadly force, that does not end the inquiry. As noted, there was ample evidence establishing that Nix he had time to retreat, including his own concession that there was no fence or other obstacle preventing him from doing so. In other words, not only was the Appellate Division correct in finding that the trial court did not err in declining to instruct the jury that the box-cutter and bat were dangerous instruments since these were factual issues to be resolved, the charge requested would not necessarily have resulted in a different verdict.

**B.    Erroneous Marshaling of the Evidence (Petition, ¶ 22(B))**

Petitioner asserts that the trial court, in marshaling the circumstantial evidence for the jury, incorrectly stated that "as [he] recall[ed]", Brantley's testimony had "plac[ed] [Petitioner] at the scene of the crime" T.1040-41. Trial counsel objected, and the following colloquy occurred:

> [DEFENSE COUNSEL]: As I recall Anthony Brantley's testimony, he saw the defendant at the alleyway at 9th—I mean at Ferry and—at the alleyway on Ferry. The crime scene was at the small sidewalk of 462 10th Street and—
>
> THE COURT: Which was said somewhat [sic], what, two houses down from the alley.
>
> [DEFENSE COUNSEL]: Yeah, but there were also any number of other people in that same area.
>
> THE COURT: Well, I understand that, but I just merely

> informed them that there was, in my opinion, some
> circumstantial evidence which was allegedly adduced to
> convince him that he was there.

T.1041. On direct appeal, the Appellate Division rejected Petitioner's contention that the trial court erred in its characterization of Brantley's testimony during its jury instructions. <u>Chapman</u>, 30 A.D.3d at 1002. Even assuming <u>arguendo</u> that the characterization was inaccurate, the Appellate Division held that the court properly instructed the jurors that they were the "sole triers of fact[,]" and "thus [Petitioner] was not denied a fair trial by the alleged inaccurate characterization of the testimony. . . ." <u>Id.</u> (citations omitted).

In reviewing an allegedly erroneous jury charge by a state court, the habeas court must ask whether the suspect charge, viewed in the entirety of all of the charges given, "so infected the entire trial such that the resulting conviction violates due process." <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977). The crux of Petitioner's argument appears to be that the trial judge defined "scene of the crime" in an overly broad fashion. The evidence showed that Nix came out from behind the house at 462 10th Street and fired at Scott, who was walking down the sidewalk next to that house toward Nix. After Scott was shot, he staggered out to the sidewalk by the house at 462 10th Street. <u>See</u> T.418-19, 489, 498-501.

According to the witnesses' testimony, Ferry Avenue and

Niagara Street run east-west, and 9th Street and 10th Street run north-south, creating a box. See, e.g., T.355, 433. The alley to which defense counsel and the trial judge referred, supra, is located between 9th and 10th Streets and also runs north-south; thus, the alley essentially parallels 9th and 10th Streets. T.433. Detective Lincoln testified that 462 10th Street is a "couple" of houses down from the intersection of Ferry Avenue and 10th Street. T.418-19. alley. Based on the configuration of the streets described above, the alley essentially bordered the lot at 462 10th Street.

Brantley testified that he saw Petitioner and Nix talking in front of a store on the corner of 9th Street and Ferry Avenue, and then walk toward the alley that ran in between 9th and 10th Streets. T.370, 406. According to Brantley, Nix and Petitioner entered the alley, but Petitioner only walked partway down the alley. Still, walking down that alley puts Petitioner relatively close to the back of the lot at 462 10th Street.

In any event, the prosecution did not argue that Petitioner was present at the moment of the shooting or that Petitioner was the shooter. Rather, the prosecution's theory of the case, based on Nix's testimony and Petitioner's admissions to, e.g., Cox and Eaddy, was that Petitioner set a trap for Scott by giving Nix a gun and steering Scott to the place where Nix was lying in wait. As Judge Broderick noted in his decision denying the C.P.L § 330.30

motion,

> [m]oments before the shooting, Nix and Chapman conspired
> near an alleyway, forming a plan to have Nix wait in the
> alley with the gun and to have Chapman locate Scott and
> tell him that Nix was in the alley waiting for him to
> resume their running confrontation. Chapman then left to
> look for Scott. Things progressed according to plan.
> Chapman contacted Scott and delivered his message,
> telling him that Nix had asked for a gun (which he was
> going to get), but was warning Scott first. Chapman,
> thus, clearly and intentionally left Scott with the
> misimpression that Nix did not yet have a gun.

SR.142.

Although the Court finds that the trial judge's phraseology in
his instruction marshaling Brantley's testimony could have been
more precise, it cannot say that there is any reasonable likelihood
that the trial judge's lack of precision affected the verdict.

**C.   Legal Insufficiency of the Evidence (Petition, ¶ 22(C))**

Petitioner argues, as he did on appeal, that the evidence was
legally insufficient because (1) the prosecutor failed to disprove
Petitioner's justification defense beyond a reasonable doubt; (2)
the evidence did not establish that Petitioner, acting as Nix's
accessory, shared Nix's intent to kill Scott; and (3) the evidence
did not sufficiently corroborate Nix's testimony. The Appellate
Division rejected these claims as unpreserved, finding that
Petitioner "failed to preserve his contentions concerning the legal
sufficiency of the evidence for [its] review by his general motion
to dismiss[,]" Chapman, 30 A.D.3d at 1001 (citing People v. Gray,
86 N.Y.2d 10, 19 (1995)), and "his motion to set aside the verdict

also did not preserve his contentions for [its] review[.]"
Id. (citing People v. Hines, 97 N.Y.2d 56, 61 (2001)). The
Appellate Division also ruled that the convictions were "supported
by legally sufficient evidence[.]" Id. Respondent argues that the
Appellate Division's reliance on an adequate and independent state
ground to dismiss the legal insufficiency claim bars it from habeas
review, notwithstanding that court's alternative holding regarding
the merits of the claim. Respondent also argues that none of
Petitioner's theories concerning the alleged insufficiency of the
evidence have merit.

The Supreme Court has held that a state criminal conviction
must be upheld if, "after viewing the evidence in the light most
favorable to the prosecution, *any* rational trier of fact could have
found the essential elements of the crime beyond a reasonable
doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in
original). Under this "rigorous standard[,]" a "'federal habeas
court faced with a record of historical facts that supports
conflicting inferences must presume—even if it does not
affirmatively appear in the record—that the trier of fact resolved
any such conflicts in favor of the prosecution, and must defer to
that resolution.'" Wheel v. Robinson, 34 F.3d 60, 66 (2d Cir. 1994)
(quoting Jackson, 443 U.S. at 326. "Under Jackson, federal courts
must look to state law for 'the substantive elements of the
criminal offense.'" Coleman v. Johnson, 132 S. Ct. 2060, 2064

(2012) (quoting Jackson, 443 U.S. at 324 n.16). Petitioner was convicted as a principal of second-degree criminal facilitation. He was convicted, as an accessory to Nix, see N.Y. PENAL LAW § 20.00, of first-degree manslaughter and second- and third-degree weapons possession.

The Court turns first to Petitioner's claim that the prosecution failed to disprove his justification defense.[2] The Appellate Division held that the prosecution "presented evidence establishing beyond a reasonable doubt that the shooter [Nix] was not acting in self defense when he drew his gun and that the shooter could have retreated." Chapman, 30 A.D.3d at 1001 (citing N.Y. PENAL LAW § 35.15(2)(a); internal quotation and other citations omitted). The Court agrees.

Both Nix and Detective Lincoln testified that nothing obstructed Nix's ability to run away from Scott. T.433, 504, 586. Although Nix testified that he shot Scott when Scott was running to the back of the house and was at the "middle of the house", T.500, the evidence established that when Nix shot Scott, Scott was not within the range in which he could have struck Nix with the bat.

---

[2]

Although Judge Broderick noted that defense of justification seemingly would have been personal to Nix, he determined to permit Petitioner to raise the defense with regard to the second (degree) intentional murder count. The jury received a verdict sheet (approved by both counsel) that provided a way to indicate whether a "not guilty" verdict on the murder charge resulted from a determination that Nix, and by extension Petitioner, had acted in self-defense. The verdict sheet, later introduced as a court exhibit, indicated that the jury rejected Nix's self-defense claim and acquitted Petitioner on other grounds, namely, that there was insufficient evidence to prove beyond a reasonable doubt that he intended to cause Scott's death.

Moreover, the bat was found at the curb, on 10th Street. T.424. The house, from the front porch to the back, was 35 to 40 feet in length. Detective Lincoln observed blood on the sidewalk near the front porch, but no blood on the sidewalk leading to the back of the house, and none on the sidewalk from the alley to the rear door of the house. T.426-32. Finally, the coroner testified that the fatal bullet was not fired within close range. T.618-19.

With regard to Petitioner's claim regarding his alleged lack of intent, the Appellate Division held that the prosecution presented sufficient proof that Petitioner "shared [Nix's] intent to cause serious physical injury to the victim and intentionally aided [Nix] by providing him with the weapon and informing the victim where [Nix] was located, thereby leading the victim" to Nix. People v. Chapman, 30 A.D.3d at 1001. Based on the testimony summarized and discussed above, "[t]he inference that [Petitioner] took part in a plan to trap and seriously injure the victim was compelling." People v. Camacho, 22 A.D.3d 367, 2005 N.Y. Slip Op. 07790, at *1 (1st Dep't 2005).

Finally, with regard to the allegedly insufficient evidence of corroboration, the Court finds that this argument is based solely on New York State's accomplice corroboration requirement, see N.Y. Crim. Proc. Law § 60.20. As such, it does not state a cognizable federal constitutional issue. Martinez v. Walker, 380 F. Supp.2d 179, 183 (W.D.N.Y. 2005) (citing Caminetti v. United States, 242

U.S. 470, 495 (1917) ("[T]here is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them.")). As the Second Circuit has explained, "[a]ny lack of corroboration goes to the weight of the evidence, not to its sufficiency, and a challenge to the weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal." United States v. Gordon, 987 F.2d 902, 906 (2d Cir. 1993). Consequently, Petitioner's legal insufficiency claim based on the lack of corroborative testimony must be dismissed. Accord, e.g., Martinez, 380 F. Supp.2d at 184 (citations omitted).

**D.   Verdict Against the Weight of the Evidence (Petition, ¶ 22(C))**

On direct appeal, Petitioner requested that the Appellate Division weigh the relative probative force of conflicting testimony pursuant to C.P.L. § 470.15(5). The Appellate Division concluded that "the verdict is not against the weight of the evidence with respect to th[e] count [of first-degree manslaughter]." Chapman, 30 A.D.3d at 1001.

By raising a "weight of the evidence" argument, Petitioner does not present to this Court a federal issue as required by 28 U.S.C. § 2254(a). E.g., Bester v. Conway, 778 F. Supp.2d 339, 345 (W.D.N.Y. 2011) ("Because Bester's weight of the evidence claim implicates only state law, it is not cognizable in this federal habeas proceeding.") (citing, inter alia, 28 U.S.C. § 2254(a); Ex parte Craig, 282 F. 138, 148 (2d Cir.1922) (holding that "a writ of

habeas corpus cannot be used to review the weight of evidence . . .”), aff’d, 263 U.S. 255 (1923)).

### E. Jurisdictionally Defective Indictment (Ground F(1.), Attachment to Petition, pp. 11-12)

Petitioner contends that count six of the indictment, which charged him with third-degree criminal possession of a weapon, was jurisdictionally defective because it did not specifically articulate that he possessed a firearm outside his home or place or business. Petitioner also challenges count five of the indictment, charging him with second-degree criminal possession of a weapon, on the basis that it did not specify that the weapon was operable. Respondent argues that this claim is unexhausted because it was not raised in state court as a stand-alone claim, although Petitioner did assert in his C.P.L. § 440.10 motion that trial counsel was ineffective for failing to challenge the jurisdictional sufficiency of the indictment on the above-mentioned grounds. Respondent argues that raising the defective-indictment claim as a predicate for ineffective assistance of trial counsel was insufficient to fairly present the claim to the state courts for exhaustion purposes. See Picard v. Connor, 404 U.S. 270, 275-76 (1971) (“emphasiz[ing] that [for purposes of exhaustion] the federal claim must be fairly presented to the state courts”; this means that “the state prisoner [is] required to present the state courts with the same claim he urges upon the federal courts”) (citations omitted).

“As courts in this circuit have consistently recognized, an

ineffective assistance claim is an insufficient vehicle for exhausting the underlying allegations when those allegations are asserted for the first time as separate claims on habeas." Hall v. Phillips, No. 04-CV-1514 (NGG)(VVP), 2007 WL 2156656, at *5 (E.D.N.Y. July 25, 2007) (citing Bond v. Walker, 68 F. Supp.2d 287, 296 (S.D.N.Y. 1999) ("An ineffective assistance claim is separate and distinct from the substantive claim incorporated in the ineffective assistance claim, such that exhaustion of the ineffective assistance claim is not exhaustion of the underlying substantive claim."); Reed v. Strack, No. 97 CV 2513, 1999 WL 187422, at *3 (E.D.N.Y. Mar. 25, 1999) (similar) (citing Levasseur v. Pepe, 70 F.3d 187, 192 (1st Cir. 1995)) (additional citation omitted)); see also Turner v. Artuz, 262 F.3d 118, 123 (2d Cir. 2001) (where petitioner challenged effectiveness of appellate counsel in a coram nobis motion, petitioner exhausted only his ineffectiveness claim, and not the claims underlying the ineffectiveness claim).

If a habeas claim has "never been presented to a state court, a federal court may theoretically find that there is an 'absence of available State corrective process' under § 2254(b)(1)(B)(I) if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile." Aparicio v. Artus, 269 F.3d 78, 90 (2d Cir. 2001) (quotation omitted). That is the case here. Petitioner already has

used the one direct appeal to which was entitled. <u>See</u>, <u>e.g.</u>, <u>Cunningham v. Conway</u>, 717 F. Supp.2d 339, 365 (W.D.N.Y. 2010) (citing N.Y. R. CT. §§ 500.20(a)(2), (d); N.Y. Crim. Proc. Law § 460.10(5); collecting cases). Collateral review in a motion to vacate pursuant to C.P.L. § 440.10(2)(c) is also barred because "sufficient facts appear on the record of the proceedings underlying the judgment" to have permitted him to raise the claims on direct appeal. See N.Y. Crim. Proc. Law § 440.10(2)(c) (mandating denial if sufficient facts appeared on the record to have permitted direct review but defendant unjustifiably failed to raise claim on direct appeal). Although Petitioner's jurisdictionally defective indictment claim must be deemed exhausted because he has no available remedies in state court, this forfeiture of the claim creates a procedural bar to this Court's review of the claim's merits. <u>E.g.</u>, <u>Gray v. Netherland</u>, 518 U.S. 152, 162 (1996) (state procedural bar which gives rise to exhaustion provides an independent and adequate state-law ground for conviction and sentence, and thus prevents federal habeas corpus review of defaulted claim, unless petitioner can demonstrate cause and prejudice for default). Here, Petitioner has not alleged cause or prejudice, and the Court has found neither on the record before it. Furthermore, Petitioner has not made the factual showing of "actual innocence" necessary to warrant the "fundamental miscarriage of justice" exception to the procedural default rule.

See Murray v. Carrier, 477 U.S. 478, 496 (1986). Accordingly, the Court finds that the procedural default remains unexcused. Petitioner's jurisdictionally defective indictment claim is dismissed on that basis.

### F.   Erroneous Jury Charge and Inconsistency of the Verdicts (Ground F(2.), Attachment to Petition, p. 12; Ground G, Attachment to Petition, pp. 12-16)

Petitioner asserts the following interrelated claims: the trial court's jury instructions regarding the offense of criminal facilitation were incorrect, thereby leading the jury to inconsistent verdicts (i.e., guilty verdicts on the criminal facilitation and manslaughter charges, and a not guilty verdict on the second-degree murder charge). Respondent argues that these claims were never raised in any state court proceeding, and therefore are unexhausted. Petitioner has not responded to Respondent's non-exhaustion argument.

Petitioner's claim that the verdicts were inconsistent is easily disposed of on the basis of non-cognizability. The Supreme Court has held that "[i]nconsistency in a verdict is not a sufficient reason for setting it aside." Harris v. Rivera, 454 U.S. 339, 345 (1981).

As to Petitioner's claim regarding the allegedly erroneous criminal facilitation jury instruction, the Court agrees that it is unexhausted, having never been presented to the state courts for review. However, it must be deemed exhausted because Petitioner

faces the absence of remedies in state court. He has already used the one direct appeal to which he is entitled, and because this is a record-based claim, it would be subject to mandatory dismissal under C.P.L. § 440.10(2)(c) if raised in a collateral motion to vacate the judgment. <u>See</u> Section III.E, <u>supra</u>. The circumstances giving rise to the construction exhaustion of this claim also create a procedural bar to this Court hearing the merits of the claim. As discussed above, Petitioner has not attempted to show cause and prejudice, or that a fundamental miscarriage of justice will occur if this claim is not reviewed on the merits in this proceeding. Accordingly, the Court dismisses it as subject to an unexcused procedural default.

### G.  Harsh and Excessive Sentence (Ground E, Attachment to Petition, p. 11)

Petitioner asserts on direct appeal, that his sentence of 25 years on the manslaughter conviction was grossly unfair given that Petitioner did not shoot Scott, and the shooter, Nix, was allowed to plead guilty to manslaughter as a juvenile offender and receive a sentence of 3 to 10 years. Petitioner requested that the Appellate Division exercise its discretionary authority under state law to review factual questions and impose a lesser term of imprisonment. The Appellate Division declined to do so, finding that "the sentence is not unduly harsh or severe." <u>Chapman</u>, 30 A.D.3d at 1002.

The Second Circuit has stated that no federal constitutional

issue amenable to habeas review is presented where, as here, the sentence is within the range prescribed by state law. White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) (citation omitted). Petitioner received the maximum sentence possible on his conviction for first-degree manslaughter, but he does not and cannot argue that his sentence was outside than appropriate statutory range. In short, his claim that the trial court abused its discretion in sentencing does not present a question of federal constitutional magnitude, and is dismissed. See, e.g., Horton v. Ercole, 557 F. Supp.2d 308, 325 (N.D.N.Y. 2008) ("Horton's claim that the trial court abused its discretion when it imposed the maximum sentence because he was twenty-one years old and he was a 'first time offender' is not a federal claim subject to review by a habeas court because judges have the authority to exercise broad discretion when imposing sentences.") (citing, inter alia, Fielding v. LeFevre, 548 F.2d 1102, 1109 (2d Cir. 1977); footnote omitted).

## IV.  Conclusion

For the reasons discussed above, the petition (Dkt. #1) is dismissed. As Petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability will issue. See 28 U.S.C. § 2253(c)(2). Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action.

-28-

**SO ORDERED.**                    S/ Michael A. Telesca

                    _____
                    HONORABLE MICHAEL A. TELESCA
                    United States District Judge

DATED:    Rochester, New York
          March 17, 2015